## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHSETTS
### EASTERN DIVISION

| | |
|---|---|
| NATHAN HARVEY and NICK DEPROSPO on behalf of themselves and all others similarly situated,<br><br>                       Plaintiffs,<br><br>v.<br><br>NATIONAL AMUSEMENTS INC. d/b/a SHOWCASE CINEMAS,<br><br>                       Defendant. | Case No.<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Nathan Harvey and Nick Deprospo ("Plaintiffs"), on behalf of themselves and all others similarly situated, states as follows for their class action complaint against Defendant, National Amusements Inc. d/b/a Showcase Cinemas, ("National Amusements" or "Defendant"):

### INTRODUCTION

1.    On December 15, 2022, National Amusements, a privately owned American movie theatre operator and mass media holding company, discovered it had lost control over its computer network and the highly sensitive personal information stored on the computer network in a data breach perpetrated by cybercriminals ("Data Breach"). Upon information and belief, the Data Breach's impact has been substantial, affecting over 82,000 current and former employees.

2.    On information and belief, the Data Breach began on or around December 13, 2022, but was not discovered by Defendant until December 15, 2022. Following an internal investigation, Defendant learned cybercriminals had gained unauthorized access to employees' personally identifiable information ("PII"), including but not limited to name, Social Security number, date of birth, and employer assignment number.

3.    On or about December 22, 2023–an appalling year after the Data Breach occurred–

National Amusements finally began notifying Class Members about the Data Breach ("Breach Notice"). Plaintiff Harvey's Breach Notice is attached as Exhibit A.

4.      Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII of Plaintiffs, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering them easy targets for cybercriminals.

5.      Defendant's Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to tell its employees how many people were impacted, how the breach happened, or why it took the Defendant an entire year to finally begin notifying victims that cybercriminals had gained access to their highly private information.

6.      Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

7.      Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

8.      In failing to adequately protect its employees' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former employees.

9.      Plaintiffs and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date

security practices to prevent the Data Breach.

10.     Plaintiffs are former National Amusements employees and Data Breach victims.

11.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiffs and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

12.     Plaintiff, Nathan Harvey, is a natural person and citizen of New York, residing in Bohemia, New York, where he intends to remain.

13.     Plaintiff, Nick Deprospo, is a natural person and citizen of New York, residing in Independence, Kentucky, where he intends to remain.

14.     Defendant, National Amusements Inc., is incorporated in Maryland, with its principal place of business at 846 University Avenue PO Box 9108 Norwood, Massachusetts 02062. Defendant can be served through its registered agent CT Corporation System at 155 Federal Street Suite 700 Boston, Massachusetts 02110.

## JURISDICTION & VENUE

15.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are over 100 putative Class Members.

16.     This Court has personal jurisdiction over Defendant because it is headquartered in Massachusetts, and regularly conducts business in Massachusetts. Plaintiffs and Defendant are citizens of different states.

17.     Venue is proper in this Court under because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

*National Amusements*

18.    National Amusements touts itself as "a world leader in the motion picture exhibition industry, operating 839 movie screens in the United States, Great Britain and Latin America."[1] It boasts over $101 billion in annual revenue.[2]

19.    On information and belief, National Amusements accumulates highly private PII of its employees.

20.    In collecting and maintaining its employees' PII, Defendant agreed it would safeguard the data in accordance with its internal policies as well as state law and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

21.    As the alleged world leader in the motion picture exhibition industry, National Amusements understood the need to protect its current and former employees' PII and prioritize its data security.

22.    Despite recognizing its duty to do so, on information and belief, National Amusements has not implemented reasonably cybersecurity safeguards or policies to protect employee PII or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, National Amusements leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to employees' PII.

*National Amusements Fails to Safeguard Employees' PII*

23.    Plaintiffs are former employees of National Amusements.

24.    As a condition of employment with National Amusements, Plaintiffs provided

---

[1] Showcase Cinemas, Linkedin, https://www.linkedin.com/company/showcasecinemas/ (last visited December 28, 2023).
[2] National Amusements, Zoominfo, https://www.zoominfo.com/c/showcase-cinemas/26312835 (last visited December 28, 2023).

Defendant with their PII, including but not limited to their name, date of birth, financial information, and Social Security number. Defendant used that PII to facilitate its employment of Plaintiffs, including payroll, and required Plaintiffs to provide that PII to obtain employment and payment for that employment.

25.    On information and belief, National Amusements collects and maintains employees' unencrypted PII in its computer systems.

26.    In collecting and maintaining PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to their internal policies as well as state and federal law.

27.    Indeed, National Amusements promises in its privacy policy that it "remains committed to responsible information handling practices."[3]

28.    According to the Breach Notice, National Amusements claims that "on December 15, 2022, National Amusements became aware of suspicious activity in our computer network." National Amusements further admits that an internal investigation revealed that "an unauthorized individual accessed our network between December 13, 2022, and December 15, 2022, and that files containing individual information may have been viewed and/or taken by the unauthorized individual." Ex. A.

29.    In other words, the Data Breach investigation revealed Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of thousands of its employees' highly private information.

30.    Additionally, Defendant admitted that Plaintiffs' and the Class's PII were actually

---

[3] Privacy Policy, Showcase Cinemas, https://www.showcasecinemas.com/privacy-policy/ (last visited December 28, 2023).

stolen during the Data Breach, confessing that the information was not just accessed but that the cybercriminals had "**taken**" files containing individual information. Ex. A.

31.    Through its inadequate security practices, Defendant exposed Plaintiffs' and the Class's PII for theft and sale on the dark web.

32.    On or about December 22, 2023–an appalling year after the Data Breach first occurred– National Amusements finally began notifying Class Members about the Data Breach.

33.    Despite its duties to safeguard PII, Defendant, a self-proclaimed leader in its industry, did not in fact follow industry standard practices in securing employees' PII, as evidenced by the Data Breach.

34.    In response to the Data Breach, National Amusements contends that it is "evaluating opportunities to improve security and better prevent future events of this kind." Ex. A. Although Defendant fails to expand on what these hypothetical "opportunities" are, such actions, if implemented at all, should have been in place before the Data Breach.

35.    Through its Breach Notice, Defendant recognized the actual imminent harm and injury that flowed from the Data Breach, so it encouraged breach victims to be "vigilant for incidents of identity theft and theft by reviewing your accounts and monitoring your free credit reports for suspicious activity" and if "you believe you are the victim of identity theft or have reason to believe your personal information has been misused, you should immediately contact the Federal Trade Commission and/or the Attorney General's office in your state." Ex. A

36.    National Amusements further recognized through its Breach Notice, its failure to provide adequate information regarding the Data Breach in the Breach notice, acknowledging that "We understand that you may have questions about this event that are not addressed in this letter." Ex. A.

37.    On information and belief, National Amusements has offered a one year of complimentary credit monitoring services to victims, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as Social Security numbers.

38.    Even with one year of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

39.    Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's National Amusements. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

40.    On information and belief, National Amusements failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its employees' PII. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

***The Data Breach was a Foreseeable Risk of Which Defendant was on Notice.***

41.    It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

42.    In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[4]

43.    In light of recent high profile data breaches, including, Microsoft (250 million

---

[4] Data breaches break record in 2021, CNET (Jan. 24, 2022), https://www.cnet.com/news/privacy/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed September 4, 2023).

records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), National Amusements knew or should have known that its electronic records would be targeted by cybercriminals.

44.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

45.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

46.    In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

47.    In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[5]

48.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in

---

[5] High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations, FBI, available at https://www.ic3.gov/Media/Y2019/PSA191002 (last accessed September 4, 2023).

their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[6]

49.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

50.     This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

51.     In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of thousands of its current and former employees in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

52.     Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated, and

---

[6]     Ransomware mentioned in 1,000+ SEC filings over the past year, ZDNet, https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed September 4, 2023).
[7] Ransomware Guide, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last accessed September 4, 2023).

published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

53.     Prior to the Data Breach, Defendant knew or should have known that it should have encrypted its employees' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Plaintiff Harvey's Experience and Injuries***

54.     Plaintiff Nathan Harvey is a former employee of Defendant and received a Data Breach notice in December 22, 2023.

55.     As a condition of employment, National Amusements required Mr. Harvey to provide his PII, including at least his name, date of birth, and Social Security Number.

56.     Mr. Harvey provided his PII to National Amusements and trusted that the company would use reasonable measures to protect it according to state and federal law.

57.     Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it for an entire year.

58.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff's PII for theft by cybercriminals and sale on the dark web.

59.     Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

60.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

61.     As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach,

reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through the three main credit bureaus, and monitoring his credit information.

62.     Plaintiff has already spent and will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of his Social Security number, will impact his ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

63.     Indeed, Plaintiff was in the process of purchasing a home when he learnt about the Breach. On information and belief, due to the numerous inquiries and credit issues stemming from the Data Breach, Plaintiff was removed from the homebuying process. As a result, Plaintiff has experienced additional frustration, anxiety, and stress regarding how this Data Breach impacted his ability to become a homeowner as well as disappointment as Plaintiff and his significant other intended the purchasing of a home together to be a pivotal moment in their relationship.

64.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's egregious delay in informing Plaintiff and Class Members about the Data Breach.

65.     Indeed, following the Data Breach, Plaintiff has experienced an increase in spam calls and texts, suggesting that his PII is now in the hands of cybercriminals.

66.     Plaintiff requests that Defendant remove and destroy his and the Class's PII, which,

upon information and belief, remains backed up in Defendant's possession.

67.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Deprospo's Experience and Injuries***

68.    Plaintiff Nick Deprospo is a former employee of Defendant and received a Data Breach notice in or around December 2023.

69.    As a condition of employment, National Amusements required Mr. Deprospo to provide his PII, including at least his name, date of birth, financial account information, and Social Security Number.

70.    Mr. Deprospo provided his PII to National Amusements and trusted that the company would use reasonable measures to protect it according to state and federal law.

71.    Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it for an entire year.

72.    Plaintiff does not recall ever learning that his PII was compromised in a data breach incident, other than the breach at issue in this case.

73.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff's PII for theft by cybercriminals and sale on the dark web.

74.    Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

75.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

76.     As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through the three main credit bureaus, and monitoring his credit information.

77.     Plaintiff has already spent and will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of his Social Security number, will impact his ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

78.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's egregious delay in informing Plaintiff and Class Members about the Data Breach.

79.     Indeed, shortly after the Breach, Plaintiff was subject to multiple fraudulent charges totaling several hundred dollars on his MasterCard that he did not recognize nor authorize, forcing Plaintiff to spend significant time and effort rectifying the situation before ultimately shutting down the card associated with these fraudulent charges. These aforementioned charges suggest that his PII is now in the hands of cybercriminals.

80.     Additionally, following the Data Breach, Plaintiff also experienced an enormous

increase of spam calls. These calls were so disruptive and constant that Plaintiff was forced to change his phone number on or around September-October 2023. This enormous increase in spam calls following the Breach further suggests that his PII is now in the hands of cybercriminals.

81.     Finally, shortly after the Data Breach, Plaintiff experienced a significant volume of password reset requests on various accounts, including Facebook and Instagram, from unknown third parties that he does not recognize nor authorize for such requests, which again suggests that his PII is now in the hands of cybercriminals.

82.     Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

83.     Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

84.     As a result of National Amusements' failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and the class have suffered or are at an increased risk of suffering:

> a.   The loss of the opportunity to control how their PII is used;
>
> b.   The diminution in value of their PII;
>
> c.   The compromise and continuing publication of their PII;
>
> d.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;
>
> e.   Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future

consequences of the Data Breach, including, but not limited to, efforts spent

researching how to prevent, detect, contest, and recover from identity theft and

fraud;

f.   Delay in receipt of tax refund monies;

g.   Unauthorized use of stolen PII; and

h.   The continued risk to their PII, which remains in the possession of Defendant

and is subject to further breaches so long as Defendant fails to undertake the

appropriate measures to protect the PII in its possession.

85.    Stolen PII is one of the most valuable commodities on the criminal information

black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to

$1,000.00 depending on the type of information obtained.

86.    The value of Plaintiffs' and the proposed Class's PII on the black market is

considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen

private information openly and directly on various "dark web" internet websites, making the

information publicly available, for a substantial fee of course.

87.    Social Security numbers are particularly attractive targets for hackers because they

can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover,

Social Security numbers are difficult to replace, as victims are unable to obtain a new number until

the damage is done.

88.    It can take victims years to spot identity or PII theft, giving criminals plenty of time

to use that information for cash.

89.    One such example of criminals using PII for profit is the development of "Fullz"

packages.

90.    Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

91.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

92.    Defendant disclosed the PII of Plaintiffs and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiffs and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

93.    Defendant's failure to properly notify Plaintiffs and the Class of the Data Breach exacerbated Plaintiffs' and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused

by the Data Breach.

***Defendant failed to adhere to FTC guidelines.***

94.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

95.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

     a.   protect the personal customer information that they keep;

     b.   properly dispose of personal information that is no longer needed;

     c.   encrypt information stored on computer networks;

     d.   understand their network's vulnerabilities; and

     e.   implement policies to correct security problems.

96.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

97.    The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

98.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

99.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

### *Defendant Failed to Follow Industry Standards*

100.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

101.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

102.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

103.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

104.    Plaintiffs are suing on behalf of themselves and the proposed Class ("Class"), defined as follows:

> **All individuals residing in the United States whose PII was compromised in Defendant's Data Breach, including all those who received notice of the breach.**

105.    Excluded from the Class is Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

106.    Plaintiffs reserve the right to amend the class definition.

107.    This action satisfies the numerosity, commonality, adequacy, and appropriateness requirements under 735 ILCS § 5/2-801(1)- (4):

a.    **Numerosity**. Plaintiffs' claim is representative of the proposed Class, consisting of over 82,000 individuals, far too many to join in a single action;

b.    **Ascertainability**. Class members are readily identifiable from information in Defendant's possession, custody, and control;

c.    **Typicality**. Plaintiffs' claim is typical of Class member's claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

d.    **Adequacy**. Plaintiffs will fairly and adequately protect the proposed Class's interests. Their interest does not conflict with Class members' interests, and Plaintiffs have

retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

      e.    **Commonality**. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for all Class members. Indeed, it will be necessary to answer the following questions:

      i.    Whether Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

      ii.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

      iii.    Whether Defendant was negligent in maintaining, protecting, and securing PII;

      iv.    Whether Defendant breached contract promises to safeguard Plaintiffs' and the Class's PII;

      v.    Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

      vi.    Whether Defendant's Breach Notice was reasonable;

      vii.    Whether the Data Breach caused Plaintiffs' and the Class's injuries;

      viii.    What the proper damages measure is; and

      ix.    Whether Plaintiffs and the Class are entitled to damages, treble damages, or injunctive relief.

      f.    **Appropriateness**. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to prosecute an

individual case. Plaintiffs are not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

g.    Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

### FIRST CLAIM FOR RELIEF
### Negligence
### (On Behalf of Plaintiffs and the Class)

108.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

109.    Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

110.    Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

111.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

112.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs' and Class Members' PII.

113.    Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

114.    Also, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

115.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

116.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

117.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of employment and/or obtaining medical services from Defendant.

118.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that

unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

119.    PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs' and Class Members' and the importance of exercising reasonable care in handling it.

120.    Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

121.    Defendant breached these duties as evidenced by the Data Breach.

122.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

   a.    disclosing and providing access to this information to third parties and

   b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

123.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs' and Class Members' injury.

124.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class Members' injuries-in-fact.

125.    Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

126.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

127.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CLAIM FOR RELIEF**
**Negligence *per se***
**(On Behalf of Plaintiffs and the Class)**

128.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

129.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

130.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs' and the Class Members' sensitive PII.

131.    Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

132.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

133.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

134.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

135.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

136.    Defendant's violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

137.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*)

**THIRD CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

138.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

139.    Defendant offered to employ Plaintiffs and members of the Class if, as a condition

25

of that employment, Plaintiffs and members of the Class provided Defendant with their PII.

140.    In turn, Defendant agreed it would not disclose the PII it collects to unauthorized persons. Defendant also promised to safeguard employee PII.

141.    Plaintiffs and the members of the Class accepted Defendant's offer by providing PII to Defendant in exchange for employment with Defendant.

142.    Implicit in the parties' agreement was that Defendant would provide Plaintiffs and members of the Class with prompt and adequate notice of all unauthorized access and/or theft of their PII.

143.    Plaintiffs and the members of the Class would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

144.    Defendant materially breached the contracts it had entered with Plaintiffs and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiffs and members of the Class by:

a.    Failing to properly safeguard and protect Plaintiffs' and members of the Class's PII;

b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

c.    Failing to ensure the confidentiality and integrity of electronic PII that Defendant created, received, maintained, and transmitted.

145.    The damages sustained by Plaintiffs and members of the Class as described above were the direct and proximate result of Defendant's material breaches of its agreement(s).

146.    Plaintiffs and members of the Class have performed under the relevant agreements,

or such performance was waived by the conduct of Defendant.

147.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

148.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

149.    Defendant failed to advise Plaintiffs and members of the Class of the Data Breach promptly and sufficiently.

150.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

151.    Plaintiffs and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

152.    Plaintiffs, on behalf of themselves and the Class, seek compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the Plaintiffs and the Class)**

153.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

154.    This claim is plead in the alternative to the breach of implied contractual duty claim.

155.    Plaintiffs and members of the Class conferred a benefit upon Defendant in the form of services through employment. Defendant also benefited from the receipt of Plaintiffs' and the Class's PII, as this was used to facilitate their employment.

156.    Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiffs and members of the Class.

157.    Under principals of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and the proposed Class's services and their PII because Defendant failed to adequately protect their PII. Plaintiffs and the proposed Class would not have provided their PII or worked for Defendant at the payrates they did had they known Defendant would not adequately protect their PII.

158.    Defendant should be compelled to disgorge into a common fund to benefit Plaintiffs and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged here.

**FIFTH CLAIM FOR RELIEF**
**Invasion of Privacy**
**(On Behalf of the Plaintiffs and the Class)**

159.    Plaintiffs incorporates all previous paragraphs as if fully set forth herein.

160.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

161.    Defendant owed a duty to its employees, including Plaintiffs and the Class, to keep this information confidential.

162.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.

163.    The intrusion was into a place or thing which was private and entitled to be private.

Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant as part of their employment, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

164.    The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

165.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

166.    Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

167.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

168.    As a proximate result of Defendant's acts and omissions, the PII of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

169.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class because their PII are still maintained by Defendant with its inadequate cybersecurity system and policies.

170.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to

Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

171.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other members of the Class, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## PRAYER FOR RELIEF

Plaintiffs and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.  Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B.  Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

C.  Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

D.  Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E.  Awarding Plaintiffs and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.  Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

G.  Awarding attorneys' fees and costs, as allowed by law;

H.  Awarding prejudgment and post-judgment interest, as provided by law;

I.  Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.  Granting such other or further relief as may be appropriate under the circumstances.

### JURY DEMAND

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: December 28, 2023,                                 Respectfully Submitted,

/s/_____
Samuel J. Strauss*
sam@turkestrauss.com
Raina Borrelli*
raina@turkestrauss.com
**TURKE & STRAUSS LLP**
613 Williamson Street, Suite 201
Madison, Wisconsin 53703
T: (608) 237-1775
F: (608) 509-4423

*Pro hac vice forthcoming*

*Attorneys for Plaintiffs and Proposed Class*

31